**CRC MARINE SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–128C.

United States Court of Federal Claims.

May 27, 1998.

its "Complaint For Declaratory and Injunctive Relief" protesting the allegedly unlawful rejection of its lowest-priced bids under U.S. Department of the Army, Military Traffic Management Command (MTMC) Solicitation Nos. NIW–97–002–CB, 1NXX–980012–Z, and 1NXX–00948–N. Plaintiff also served Lockwood Brothers, Inc. And S.C. Loveland Co., Inc., the awardees of the contracts in issue. Neither has filed an appearance in this case.

Plaintiff alleges that it has been *de facto* debarred from performing the above solicitations and that this debarment is based on plaintiff's previous suspension and debarment from April 1991 to April 1996. Thus, plaintiff requested that the court enter a temporary restraining order and preliminary injunction prohibiting defendant from proceeding with award to or performance by anyone other than plaintiff of these three solicitations. By order dated February 25, 1998, after a telephone conference call with counsel for the parties, the request for a temporary restraining order and preliminary injunction was denied. On March 9, 1998, plaintiff filed a "First Amended Complaint" seeking the same relief. Thereafter, on March 26, 1998, plaintiff filed a "Motion for Permanent Injunction" or in the alternative, summary judgment on the amended complaint. Defendant has opposed plaintiff's motion for a permanent injunction and requests dismissal of plaintiff's complaint. Essentially this action is a post-award bid protest. This court has jurisdiction over the plaintiff's post-award bid protest action. *See* 28 U.S.C. § 1491(b) (1994), *as amended by* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–75; *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 669 (1997).

After careful review of the Administrative Record as supplemented by limited discovery and other materials, the parties' briefs, and after a limited hearing held on April 9–10, 1998, and oral argument held on May 20, 1998, the court finds no merit to any of plaintiff's claims. Accordingly, for the reasons discussed below, plaintiff's motion for a permanent injunction is denied and plaintiff's complaint is dismissed.

Alan M. Grayson, McLean, VA, for Plaintiff.

Mark L. Josephs, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Kathryn A. Bleecker, for Defendant. Maj. Daniel K. Poling, Department of Army, Office of Judge Advocate General, and Glenn P. Harris, Small Business Association, of counsel.

## OPINION

LYDON, Senior Judge:

On February 18, 1998, CRC Marine Services, Inc., a Rhode Island corporation, filed

## FACTS

Currently, Joseph C. Calore, Sr. (Calore) is the president, sole stockholder, and owner of CRC Marine Services, Inc (plaintiff or CRC), a company that provides marine transportation services. At times material herein, the only employees of CRC were Calore and one of his sons. CRC has previously operated under the names, "Calore Rigging Corp.," "Eastern Marine Transport, Inc.," and "CRC Marine Division." Plaintiff has operated under the name "CRC Marine Services, Inc." since December 1992. Calore began performing trafficking contracts, generally road contracts, in 1946 under the name "Calore Express" and has been performing barge movements for about twenty-five years. In addition to providing marine transportation services, Calore also had provided trucking services as owner of Calore Freight Systems. Calore, however, transferred ownership of Calore Freight Systems to his four sons in 1985.

Calore did not own any barges at times material herein, although he owned some rigging equipment and certain pieces of equipment suitable for barge use. As a result, Calore was dependent on subcontractors to obtain barges for the performance of barge transportation contracts.

Calore testified as to having performed hundreds if not thousands of transportation contracts. Most of these, indeed nearly all of these contracts, must have been performed prior to 1989. The government's dissatisfaction with Calore's performance of a Department of the Army, Military Traffic Management Command (MTMC) barge shipment in 1989 and an investigation into allegations of submissions of false claims related to that contract resulted in Calore's suspension and eventual debarment from performing government contracts up to April 1996. Also during this period, Calore testified he suffered from a number of illnesses.

Plaintiff has been awarded at least six contracts since the end of his debarment.

All of these contracts were single movements, known in the trade as "spot bid" contracts, a term which will be discussed later in this opinion. At the time of the hearing, plaintiff had just finished a MTMC spot bid barge transportation contract. Nevertheless, plaintiff alleges that it was *de facto* debarred from the three solicitations at issue based on Calore's prior debarment. Plaintiff goes so far as to allege that the government has a "vendetta" against Calore and that it will continue "blacklisting" him unless the court ends the "persecution." In support of these allegations, plaintiff mischaracterizes items in the Administrative Record and the testimony of the witnesses. Although the court finds that the Administrative Record is not clear on some of the matters raised by plaintiff, there is nothing in the Administrative Record or the subsequent evidence adduced during the hearing that supports plaintiff's allegations that any government agent involved in these three solicitations bore any bias, animosity or hostility towards Calore.

### 1. *Solicitation No. NIW–97–002–CB, The "Mount Vernon Requirement"*

On August 28, 1997, MTMC issued a "Guaranteed Traffic" (GT) solicitation,[1] known as the Mount Vernon Requirement, for the transportation by barge of reactor vessels and steam generators from Mount Vernon, Indiana to Newport News Shipbuilding, Hampton, Virginia, and Norfolk Naval Shipyard, Portsmouth, Virginia. The steam generators weigh 362,000 pounds each and the accompanying shipping hardware 45,000 pounds. The reactor vessels weigh 546,000 pounds each and the shipping frames 55,774 pounds each. These items were very expensive pieces of machinery. A total of nine shipments were planned under this contract (eight shipments of steam generators and one shipment of reactor vessels). The above items were critical components in the construction of the aircraft carrier *Ronald*

---

1. MTMC conducts most of its transportation business pursuant to "guaranteed traffic" solicitations or "spot bid" solicitations. Guaranteed traffic solicitations generally require repetitive movements allocated over a 24–month period. A spot movement, generally, is a one-time movement requirement, accomplished, normally, within 30 days. *See Port Arthur Towing Co., Inc.,* 89–3 B.C.A. (CCH) ¶ 22,004 at 110,630, 1989 WL 74396 (A.S.B.C.A. May 17, 1989), *appeal denied,* 90–2 B.C.A. (CCH) ¶ 22,857, 1990 WL 101360 (A.S.B.C.A. April 12, 1990).

*Reagan,* a national defense project. The solicitation provided details regarding the equipment to be shipped and included various equipment and service requirements that offerors would have to meet to obtain the contract. The solicitation required, in pertinent part, that the:

Carrier must provide ocean going tug and American Bureau of Shipping certified and United States flag Loveland 1721 series barge 172 feet, 6 inches long by 43 feet, 6 inches wide (with a deck plate thickness of not less than 3/4 inch deck) or equivalent flat cargo size barge of sufficient horsepower to maneuver and position tug and barge for loading and unloading at origin and destination.... If carrier provides other than a Loveland 1721 series barge they must go through a pre-award design analysis to prove the barge and its internal members are structurally acceptable to carry the intended load. The analysis will be submitted to HQMTMC. The loaded barge must be shown to be stable when loaded.

\* \* \* \* \* \*

... A naval architect or marine engineer must certify to the structural and stability acceptance of each shipment configuration before the first shipment is made. Barge drawings shall be submitted along with the structural and stability analyses for each shipment. Configuration shall be presented in a report format to the shipper no later than 30 days following notification of acceptance of the awarded agreement.

The solicitation further provided that the "structural analysis shall include a detailed evaluation showing that the barge deck is capable of handling the load when subjected to the shock loading." Required transit time was 16 to 24 days. The solicitation also included an "estimated" schedule for shipment. Pursuant to the solicitation the actual requirements for transportation services were to be "allocated to the responsive, responsible carrier whose tender offer is most advantageous to the DOD."

On or about September 26, 1997, Calore submitted a tender rate of $159,600 per shipment and $195 per hour for demurrage, basically compensation for delay in utilization of the barge after presentation for loading or docking for unloading. CRC was notified shortly afterward that it was the apparent low bidder of the five firms who bid on this solicitation.[2]

On October 7, 1997, MTMC conducted a pre-award survey with CRC in Mount Vernon, Indiana.[3] In attendance were Cynthia Barbaro (Barbaro), the Traffic Management Specialist who prepared the solicitation and was the contracting officer relative thereto, Calore,[4] and representatives from Westinghouse Electric Company (Westinghouse), the prime contractor who manufactured the reactor vessels and steam generators which were to be shipped. Prior to the pre-award survey, on October 1, 1997, Barbaro faxed to

---

2. The five firms bid as follows:

   1) CRC—$159,600 per shipment and $195 per hour demurrage.
   2) Lockwood Brothers, Inc.—$162,450 per shipment and $200 per hour for demurrage.
   3) Troika International, Ltd.—$177,633.33 per shipment and $4,500 per day for demurrage.
   4) S.C. Loveland Co., Inc.—$179,618 per shipment and $213 per hour for demurrage.
   5) Weeks Marine, Inc.—$381,525 per shipment and $250 per hour demurrage.

   MTMC returned Troika's bid on October 22, 1997 without evaluating it because Troika's bid was not submitted in the required format, i.e., demurrage should have been submitted per hour instead of per day. Therefore, MTMC evaluated only four bids for the Mount Vernon Requirement.

3. A pre-award survey is "an evaluation by a surveying activity of a prospective contractor's capability to perform a proposed contract." 48 C.F.R. § 9.101. It "is normally required only when the information on hand or readily available to the contracting officer, including information from commercial sources, is not sufficient to make a determination regarding responsibility." 48 C.F.R. § 9.106–1.

4. Apparently, Calore reluctantly attended what is derisively referred to in CRC's complaint as a "gathering billed as a 'pre-award survey.'" Plaintiff's complaint states that "because of CRC's many years of experience in performing similar jobs for MTMC, including many that were far more complex, there was no reason to doubt that CRC was capable of performing the Mount Vernon Requirement." At the hearing in this case, Calore backed off from this claim and acknowledged that pre-award surveys were standard practice and indeed were useful because "things change."

Calore, and presumably the other bidders, a five page list of the items the pre-award survey would focus on. These items paralleled the requirements of the solicitation. The list included the following items:

A. Carrier must provide ocean going tug and American Bureau of Shipping and United States flat Loveland 1721 series barge 172 feet, 6 inches long by 43 feet, 6 inches wide (with a deck plate thickness of not less than 3/4 inch deck) or equivalent flat cargo size barge of sufficient horsepower and maneuver and position tug and barge for loading and unloading at origin and destination. If other than a Loveland series barge carrier should describe their type of barge. Barge must be able to handle the steam generators and reactor vessels as described in the solicitation.

B. Carrier must be able to meet transit time 16 to 24 days as specified by shipper on the GBL.

\*    \*    \*    \*    \*    \*

D. Carrier will provide exclusive use of tug and barge.

E. In the case of multiple shipments, the carrier must provide one tug and (sic) each barge. Carrier cannot tandem-tow.

\*    \*    \*    \*    \*    \*

R. Carrier shall carrier (sic) a minimum of $1,000,000 cargo insurance. The shipping company shall also comply with the commercial insurance requirements which apply. Proof must be provided to MTMC.

\*    \*    \*    \*    \*    \*

AA. Carrier able to meet estimated shipping schedule in the solicitation.

BB. Technical Capability

1. Carrier has the personnel, adequate equipment available, and resources to accomplish the task.

2. A general statement pertaining to the carrier's background over the past five years that is pertinent to the performance of this move.

3. Specify availability of personnel, back-up sources as necessary to accomplishing the move.

(A) Tug and Barge Equipment

(B) Navigational Knowledge

(C) Office Administrative Ability

(D) Experience

CC. Carrier Responsibilities and Resources

1. Demonstrate that sufficient services and capabilities are available under their control, or provide acceptance evidence of their ability to obtain the required resources, i.e., commitment, or explicit agreement that will be existence by the effective date of the tender, to rent, purchase, or otherwise acquire the needed equipment, or other resources, or personnel to perform all the services required by the MTMC solicitation.

2. Financial Resources.

DD. Carrier to Provide Evidence of its Transportation Safety Record.

\*    \*    \*    \*    \*    \*

FF. Structural Analysis:

1. The Structural analysis shall include a detailed evaluation showing that the barge deck is capable of handling the load when subject to the shock loading. . . .

Calore acknowledged that he had received this agenda prior to the pre-award survey. Barbaro conducted the pre-award survey. During the two and a half hour meeting, Barbaro went through the agenda item by item. It is undisputed that the matter of Calore's previous debarment was not raised during the course of the meeting. Calore was questioned about the equipment available or potential equipment CRC proposed using to perform the contract. In response to the questioning Calore provided MTMC with only one document, a one page September 17, 1997 quotation from Ocean Motions, naval architects, pertaining to the cost of performing structural and stability calculations for a "Witte 106" barge. While this document listed the prices for performing certain calculations and drawings it also noted that Ocean Motions had not yet received the "Witte 106" drawings from Donjon, presumably, the barge manufacturer. Calore testified that he was leasing the "Witte 106" at the time and that he intended using it as a back-up on the Mount Vernon Requirement. With the exception of the one page document

mentioned above, Calore's presentation at the pre-award survey was completely verbal. Calore contends that he did not present or submit any other documentation, which he claimed he had with him at the pre-award survey, because they were not asked for. The court gathers from Calore's testimony that, generally, Calore conducted business verbally. He would produce written documentation only when asked.

In contrast to CRC's pre-award presentation, on October 23, 1997 Lockwood, the next lowest bidder, submitted a twenty-eight page packet addressing the items raised in Barbaro's pre-award survey agenda including written answers to certain items, tug specifications, barge drawings and letters of commitment for barge and tug services, a partial work listing of seventy-nine moves that took place from 1993–1997, ten photographs of previous projects (including movements of steam generators), a statement from its insurance carrier reflecting good standing, a certificate of liability insurance (coverage until 4/1/98), and a financial report prepared by Dun and Bradstreet.

When asked about his background at the pre-award survey, Calore discussed moves that he performed in the 1980s. During the hearing in this case, Calore testified that the last time he performed a move of this size and complexity was in the early 1980s. As discussed above, Calore did not work much from 1989 to 1996 because of investigations, his suspension and subsequent debarment, and his various illnesses. At the time of the pre-award survey, Barbaro, the contracting officer, was unaware of Calore's prior debarment.

After the pre-award survey, Barbaro and Westinghouse prepared reports, based on their contemporaneous notes taken at the meeting, assessing CRC's capabilities with respect to the items under review. Barbaro's October 21, 1997 report stated in pertinent part that:

A. CRC Marine Services did not have a clear understanding of what was in the solicitation package. It was very clear that they had based their bid on the assumption of what they had done around 1985. We did finally determine that it was not a(sic) steam generators or reactor vessels that Calore had moved back around 1985. He had no evidence of experience in moving something similar within the last 5 years. Throughout the entire meeting I could not keep him on the agenda. He kept referencing what he did in 1985 and other items he had done in the past. As we discussed the solicitation CRC was not clear and at times he expressed his excitement that certain items would save him money. To me this was a clear picture that CRC had not read the solicitation clearly and did not understand the bid. CRC could not identify details regarding the proposed barges that will be used to transport the prime carrier's equipment. He said that he had one barge in mind but no details on the barge other than it was a Witte 106 1992/3 barge. He was going to look at some new equipment being manufactured by Come which was scheduled to be finished by the second week of January. During the meeting numerous times we explained to him that their (sic) would be 3 shipments close together and that he [would] have to plan on using 3 barges if necessary.... [H]e tried to get Westinghouse to give him a guarantee that the first 3 shipments would be the exact times in the solicitation. I told him we would have to look into it and get back. He kept pressed (sic) the issue on trying to make us put it in writing that the first 3 shipment[s] were firm and so that he could find equipment.

\* \* \* \* \* \*

B. CRC did not have a true knowledge of the transit time. He claimed it would take 12 days. The GT [Guaranteed Traffic solicitation] stated 16 to 24 days. This was based on previous moves.

R and S. CRC acknowledged the specific insurance and performance bond requirements; however, no details how this requirement would be met and no concrete evidence of insurance was provided.

\* \* \* \* \* \*

3. CRC did not produce any evidence of commitments or explicit agreements regarding either the tug or barge require-

ments to support the required shipments. There had been only verbal discussion with A1 towing and Come.

4. No plans regarding specific personnel or back-up resources. They did agree to find 2 more barge as a contingency in case of delay of the new construction barges.

BB.... 2. We tried to get CRC to tell us the history of his company, but we hardly got anything out of him. CRC Marine has been in business since 1946, however, he has been sick for the last 10 years. Other than that we know nothing about his company.

CC. CRC did not provide any evidence of financial stability of their company.

DD. CRC did not provide any evidence of their safety record. The only statement he made was he has not had an accident in 40 years.

Plaintiff charges that Barbaro's report, set forth above, was false, but the totality of the record supports the reliability of her report.

Westinghouse's impressions of CRC's capability to perform the contract were no different than Barbaro's. With respect to the equipment to be used, Westinghouse found that CRC "could not identify details regarding the proposed barges that will be used to transport the prime contractor equipment. CRC Marine's plan for the first three shipments was unsubstantiated and undocumented." Westinghouse expected that the contract's tight shipping schedule would require the use of three separate barges. Westinghouse listed a number of concerns with CRC's "verbal plan," among them were: (1) CRC's plan only included two in-fabrication barges and CRC "was not able to present a fabrication schedule and did not have a contingency plan in mind should the barge fabrication be pushed out"; (2) CRC did not have a formal agreement with the manufacturer of the barges to lease the two barges; (3) CRC did not have a contingency plan

prepared to eliminate delay of shipment in the case of delay of fabrication or of the certification of the new barges; and (4) CRC was not prepared to discuss the design of the new construction barges to show them to be the type required for the contract. Additionally, Westinghouse found that "[a]ll personnel, equipment, and resources for the CRC Marine shipping plan are to be subcontracted. CRC Marine did not identify firm arrangements for any of this effort. No plans were provided in writing and verbal discussions were unsubstantiated;" and that CRC "did not produce any evidence of commitments or explicit agreements regarding either the tug or barge requirements to support the required shipments. There had been only verbal discussion with A1 Towing." Westinghouse, like Barbaro, noted Calore's request for a guaranteed shipping schedule.

Westinghouse's report of the pre-award survey is likewise considered reliable by the court. Too, there is no evidence in the record that any Westinghouse official was aware of plaintiff's debarment at the time of the pre-award survey.

MTMC, by letter dated November 18, 1997, informed CRC that its pre-award survey presentation did not convince MTMC that CRC was "presently responsible to handle the subject movement," and therefore its bid was rejected.[5] Barbaro wrote this letter for her supervisor, Colonel Donald W. Lamb (Colonel Lamb), Director, Joint Traffic Management Office. In this letter MTMC explained its decision, in pertinent part, as follows:

There was mention of one existing contingency barge but there was no evidence showing that the barge was acceptable. There is a possibility that there will be three separate barges needed for the first three moves. As the shipping schedule is currently estimated there will not be enough time for one barge to return in time to pick up the next shipment. We

---

5. The FAR provides in part that:

(a) Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only.

(b) No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility.

48 C.F.R. § 9.103

were not shown any evidence of other barges that would be used for these moves. There were possibilities but nothing lined up with a tentative agreement to convince us you were prepared to make the moves. You stated that the shipping schedule must be guaranteed by the Government, with no allowance for schedule changes so that you could acquire equipment. Your proposed limitation is not consistent with the original bid requirements which provided estimated dates.

All personnel, equipment, and resources for the move were to be subcontracted. There was no proof in writing or verbally to identify firm arrangements for any of these efforts. No plans were provided in writing and verbal discussions were unsubstantiated.

You were unable to provide a statement or evidence of your company's recent background in performing shipments of a similar nature. You were unable to demonstrate a clear understanding of the Government's service requirements. You were not prepared to show evidence regarding your current or historical financial condition, safety record, and performance of barge shipments.

The record in this case supports the conclusion that the above determination was reasonable and rational and reflected a fair and honest consideration of plaintiff's bid under the given circumstances. There was no credible evidence that plaintiff was *de facto* debarred relative to MTMC's consideration of plaintiff's bid.

By letter dated November 19, 1997, MTMC awarded the Mount Vernon Requirement to Lockwood Brothers, Inc. (Lockwood), the second lowest bidder.[6] AR 234. Lockwood's bid was slightly higher than CRC's at $162,450 per shipment and $200 per hour of demurrage.

On December 2, 1997, CRC filed a bid protest of this award with the United States General Accounting Office (GAO) contending that, (1) the contracting officer's allegations about the supposed shortcomings in CRC's offer were false; (2) MTMC should not have rejected CRC's bid on grounds of "non-responsibility" without first referring CRC to the United States Small Business Administration (SBA) under its mandatory Certificate of Competency (COC) program;[7] and (3) that the agency improperly conducted a sealed-bidding procurement using negotiated procurement methods.[8] On December 29, 1997, MTMC, recognizing its error in not referring the matter to the SBA for a COC determination after finding plaintiff's bid non-responsible, referred CRC's bid to the SBA under the COC program.[9] As a result, CRC withdrew its GAO protest.

---

6. In its complaint, plaintiff assails Lockwood as "a company with less experience and a past performance record less satisfactory than CRC's." In addition to noting that plaintiff provides no support for this allegation, it is interesting to note that plaintiff apparently had no qualms about using Lockwood and its barges as a subcontractor on many of its contracts despite Lockwood's alleged lack of experience and less than satisfactory performance record.

7. Section 19.601(a) of the FAR provides:

A Certificate of Competency is the certificate issued by the Small Business Administration (SBA) stating that the holder is responsible (with respect to all elements of responsibility, including but not limited to capability, competency, capacity, credit, integrity, perseverance, and tenacity) for the purpose of receiving and performing a specific Government contract.

48 C.F.R. § 19.601(a). The SBA must issue a COC decision within 15 days of receiving the contracting officer's referral. FAR § 19.602–2(a).

8. Plaintiff did not raise this point as a claim in its complaint nor did it discuss it in its briefs, during the hearing or at oral argument, and therefore, was not considered by the court.

9. FAR § 19.602–1 provides in pertinent part:

(a) Upon determining and documenting that a responsive small business lacks certain elements of responsibility (including, but not limited to, competency, capability, capacity, credit, integrity, perseverance, and tenacity), the contracting officer shall—
(1) Withhold contract award ...; and
(2) Refer the matter to the cognizant SBA Regional Office in accordance with agency procedures ...
(c) The referral shall consist of—
(1) A notice that a small business concern has been determined to be non-responsible, specifying the elements of responsibility the contracting officer found lacking; and
(2) If applicable, a copy of the solicitation, drawings and specifications, preaward survey findings, pertinent technical and financial in-

By letter dated January 2, 1998, Colonel Lamb notified the SBA that "[d]ue to the mission-critical requirement for these steam generators to reach destination on schedule, we are going to have to proceed to move the first three shipments using the spot bid negotiation procedure, while you are making your determination." In addition to this notice, MTMC enclosed information from its files on Calore pertaining to the government's investigation into alleged false claims by Calore and Calore's suspension and December 30, 1992 debarment.[10] As indicated earlier, Barbaro, the contracting officer, was unaware of Calore's prior debarment at the time she found plaintiff to be non-responsible. MTMC's Legal Counsel office provided Barbaro with the files containing the prior debarment information for submission to the SBA. MTMC stated that this information showed that "past performance was lacking in previous efforts. We therefore, strongly believe he is not competent to handle the time-sensitive job on which he bid."

Subsequently, The SBA informed CRC, by letter dated January 5, 1998, that:

The SBA has been advised that your bid on the [Mount Vernon Requirement] has been rejected despite being the apparent low bidder. The procuring activity has made this determination because there is reason to question your technical, equip-

ment, performance, and financial capabilities and therefore your overall capability to perform in a satisfactory manner.

... SBA personnel will perform *an independent review* of your capabilities to perform to the solicitation's requirements. A facility visit and additional information may be required to verify your capabilities. *It must be emphasized that it is solely your responsibility to demonstrate competency to perform ....*

To apply for a COC you must submit all the data and forms requested in the attached "COC APPLICATION INSTRUCTION SHEET".

(Emphasis added). The "COC APPLICATION INSTRUCTION SHEET" required written information on CRC's suppliers and subcontractors, present plant load, facilities and equipment, personnel, price build-up, production planning, quality assurance cash flow, profit and loss statements, and balance sheet.

Robert T. Roncaglio (Roncaglio), an Industrial Specialist in the SBA Government Contracting Office, reviewed the documents CRC submitted in support of its COC application. Roncaglio has been an Industrial Specialist for eleven years. Prior to that he was a Quality Assurance Specialist at the General Services Administration. In his eleven years as an Industrial Specialist Roncaglio has re-

---

formation, abstract of bids (if available) and any other pertinent information that supports the contracting officer's determination.

10. The documents refer to the Department of Justice's 1991 investigation into alleged false certifications, false statements, and false claims made and submitted by Calore, and Calore's failure to complete another government shipment. As a result of these investigations Calore was suspended from contracting with the government beginning on April 29, 1991 and later disbarred beginning December 29, 1992 to April 29, 1996. Calore did not contest the debarment action. Brigadier General Kenneth D. Gray, Suspension and Debarment Official, concluded in his December 30, 1992 memorandum of decision on the debarment that:

CRC abandoned the two nuclear reactors approximately 10 to 12 miles from destination [while performing the Iuka shipment]. CRC failed to complete movement and installation of the reactors inside building # 41, NWSC, as required by the terms of the GBL. CRC and

Joseph C. Calore, Sr., made and submitted false certifications, false statements, and false claims to the Government.... Such conduct indicates a lack of business integrity or honesty and is of so serious or compelling a nature that it affects the present responsibility of CRC as a Government contractor or subcontractor.

Plaintiff, in its submissions, seeks to explain away and minimize the incidents underlying his debarment. But the debarment was uncontested and is now an historical fact. On this record, there is no indication that the facts underscoring the debarment played any part in the consideration of plaintiff's bids for the solicitations in issue. The record supports the view that the fact of debarment served only to explain plaintiff's lack of performance and financial history over a period of some 8 or 9 years. The debarment ended April 29, 1996, less then a year and a half before the Mount Vernon Requirement solicitation was issued on August 28, 1997. The end of the debarment was certainly within the three year time frame stressed by plaintiff as the ledger for analysis of plaintiff's performance and financial history.

viewed about 300 COC applications. CRC's, however, was the first involving transportation by barge. In those instances when Roncaglio is unfamiliar with the technical terms used in a solicitation, Roncaglio relies on and defers to the solicitation's contracting officer's interpretation.

After reviewing the solicitation and the information supplied by Calore, Roncaglio concluded that the documents CRC had provided were inadequate to meet the firm's burden of showing that it was capable of successfully performing the contract. Indeed, Roncaglio noted that CRC had failed to provide documents relating to six of the seven categories of technical information requested on the "COC APPLICATION INSTRUCTION SHEET", i.e., information on present plant load, facilities and equipment, personnel/labor, price build-up, production planning, and quality assurance. Moreover, Roncaglio noted that CRC had failed to provide adequate financial information. In an effort to fill the gaps in CRC's submission, Roncaglio called Calore on January 12, 1998 and advised him of the deficiencies in his submissions and gave him the opportunity to submit the relevant documentation. Calore testified that Roncaglio was "hostile" toward him in this conversation but Roncaglio denied any hostility and stated he dealt with Calore in the same manner as he dealt with all applicants. The following day, in response to Roncaglio's request, CRC faxed an additional twelve pages of documents to Roncaglio. Included was a two page letter outlining Calore's plan for performing the Mount Vernon Requirement, a two page COC application, a one page CRC "Balance Sheet," six pages of government freight waybill's for six shipments CRC had recently performed, and one page was MTMC's final bidding results for the Lynn Requirement (one of the three solicitations at issue in the case at bar). Plaintiff's submissions to the SBA are to be contrasted with the one page document plaintiff submitted to MTMC.

Also on January 13, 1998, Cashman Equipment Corporation of Boston, Massachusetts, faxed to Roncaglio information on the specifications, delivery and availability of two barges it apparently would subcontract to

CRC. Both barges were still under construction. According to the specifications barge "JMC–46" would be available on March 15, 1998 and barge "JMC–50" would be available on June 15, 1998. The hull plate thickness of both barges was 1/2 inch.

Roncaglio prepared a seven page COC report dated January 20, 1998 recommending denial of CRC's COC application. In his report Roncaglio stated in pertinent part:

> Mr. Joseph Calore was advised via telecon on 01/12/98 that information supplied by his firm was completely inadequate. Mr. Calore had failed to include full information on subcontractors and supplied no information on present plant load, facilities and equipment, personnel/labor, production planning and quality assurance. Additionally, profit and loss statements for the past three years were not supplied nor was a current balance sheet. Mr. Calore was informed that verbal information was unacceptable and that he must supply requested information *in writing* immediately. He was informed that failure to supply requested information would cause this office to conclude that these areas had not been adequately addressed.

(Emphasis in original). Additionally, Roncaglio referenced CRC's January 12, 1998 letter outlining how and with which firms it was going to perform the contract. Roncaglio noted "To date requested documentation evidencing firm commitments or explicit agreements with these firm's have not been supplied." Under the heading "Material Availability" Roncaglio listed numerous instances where CRC had failed to meet its burden of showing it could perform the contract. Roncaglio concluded that:

> It is the opinion of this I/S [Industrial Specialist] that CRC Marine has failed to evidence firm agreements for the acquisition of barges that meet MTMC requirements. The suitability of the vessels CRC proposes to use will be determined after a contract is awarded. Nothing supplied by CRC gives confidence that this will happen. Mount Vernon Towing made it quite clear to this I/S that they did not have a formal agreement with CRC and their availability depended on other work they

[Mount Vernon] had at the time.[11] Additionally, CRC intends to have the subject items "fleet towed" from Cairo, Illinois down the Mississippi river to New Orleans in violation of contract terms. In view of the aforementioned, material availability is *not* considered adequately demonstrated. (emphasis in original).

Under the heading "COC ELIGIBILITY" Roncaglio listed CRC's three year dollar average for the years 1995, 1996, and 1997. The three year dollar average was $155,000 with $0 income for the years 1995 and 1996. Therefore, Roncaglio concluded that CRC "is considered to be a small business eligible for COC consideration." Immediately below this determination Roncaglio, in an obvious attempt to explain why CRC had no income for the years 1995 and 1996, wrote "CRC had been debarred from government business until April 1996." [12]

Roncaglio also determined that Calore's production planning was not satisfactory. The "COC APPLICATION" instruction sheet required Calore to "provide a time based milestone chart for performance of the contract from date of award to completion for all contract requirements, including first articles and data times." Calore's written submissions gave no indication of how much time he estimated for the moves. During a second telephone call with Calore, Roncaglio asked Calore how long "the trip" would take. Calore answered twelve to fourteen days. Roncaglio, relying on transit times suggested by Calore's proposed towing companies, estimated a total transit time of twenty-seven days. Thus, Roncaglio found that Calore underestimated the required transit time. At the hearing, plaintiff argued that Calore was only referring to one leg of the trip.

Roncaglio, however, stated that he was merely relying on what Calore had said during the telephone call. To Roncaglio, "the trip" meant the whole trip, not a portion of it. If there was a misunderstanding in this regard, it was more Calore's fault than Roncaglio's.[13] More importantly, as the SBA advised Calore initially, "It must be emphasized that it is solely your responsibility to demonstrate competency to perform."

CRC's financial capabilities were reviewed by James P. Lavin (Lavin), a loan officer in the SBA district office in Providence, Rhode Island. Lavin, in a report dated January 15, 1998, determined that CRC failed to provide adequate information to show that it had the financial means to perform the contract. Under the heading "CREDIT ANALYSIS" Lavin wrote:

SBC [Small Business Concern] has provided minimal financial information and it is not reliable, at that. For example, tax returns provided are virtually blank, reporting no revenue for 1996, cash flow projection reflects no debt service to match the reported $50m line availability, there is no corporate balance sheet yet the Principal's personal assets include $86m in "rigging equipment", etc.

Of great concern is the history of debarment, which supersedes the financial information in this recommendation. As it impacts analysis, the debarment coupled with the substandard financial reporting indicates that this is not a prudent bid, either for the government or the SBC (i.e. if performance penalties are imposed). This is a particularly time-sensitive and mission-critical contract, involving the transport of nuclear equipment.[14] There is no evidence submitted to support the financial

---

**11.** Roncaglio spoke by phone with Stan Billman of Mount Vernon Barge Service on January 15, 1998. Calore's letter dated January 12, 1998, stated that Mount Vernon Barge Service was to place the barge at Mount Vernon, Indiana and after it was loaded, tow it to the fleeting area in Cairo, Illinois.

**12.** When the court suggested to Calore that Roncaglio's mention of CRC's debarment was simply for the purpose of explaining its $0 balance for the years 1995 and 1996, Calore readily agreed that this was a reasonable explanation.

**13.** It bears mention that both Barbaro and Westinghouse also were left with the impression that Calore estimated the trip would take 12–14 days.

**14.** The items to be shipped were critical to the construction of the aircraft carrier *Ronald Reagan* since these items had to be installed in the lower portion of the carrier before upper level construction took place. As soon as these items were manufactured and prepared for shipment they had to be moved quickly from the plant to the aircraft carrier.

capacity of the SBC to successfully perform the work.

Marilyn A. Bogue (Bogue), a supervisory economic development specialist, concurred that the financial information was "inadequate to support a vote of confidence" and that the firm did not have a financial "cushion in event of cost overruns or delays on this time-sensitive contract." Neither Lavin nor Bogue were deposed or testified at the hearing.

On January 21, 1998, a COC Review Committee unanimously recommended to deny CRC's application for a COC for the Mount Vernon Requirement. The Committee was comprised of Roncaglio (who participated as a nonvoting observer) and four other SBA officials. It should be noted that Lavin was not a member of this Committee. The Committee forwarded its recommendation to Janette Fasano (Fasano), the Director of the SBA Area I Government Contracting Office, who concurred with the Committee's recommendation. That same day, Fasano wrote to Calore advising him that CRC's application had been denied. Fasano stated that:

> The Small Business Administration has given careful consideration to the application of your firm for a Certificate of Competency and finds a lack of assurance that the proposed contract would be completed as required by the solicitation and further finds no sufficient reason for disagreeing with the decision of the contracting officer. Your firm's technical, equipment, planning, performance, and financial capabilities are unsatisfactory for this procurement.
>
> We regret that present conditions do not justify issuance of a Certificate of Competency in this instance. I trust that your company will continue to avail itself of the many small business aids offered by this agency and hope that we may be of service to you in the future.

The record persuades the court that plaintiff's COC application was given fair and honest consideration by the SBA and that its decision was rational and reasonable under the circumstances. There is no substantial evidence that plaintiff's prior debarment was a factor in the SBA's determination. The SBA found no reason for disagreeing with the decision of the contracting officer, which

decision, as mentioned earlier was rendered before the contracting officer had any knowledge of the prior debarment.

Three of the nine shipments covered by the Mount Vernon Requirement have been completed. The first shipment was successfully completed by Lockwood on March 19, 1998. The third shipment was completed on April 23, 1998. The second shipment, completed on April 1, 1998, was performed pursuant to MTMC's spot bid program which will be discussed next.

## 2. · Solicitation No. 1NXX 980012N (the Mount Vernon Spot Bid)

On January 9, 1998, while CRC's COC application was pending, MTMC's Bayonne, NJ, contracting activity issued a spot bid solicitation, No. 1NXX 980012–N, for the second of the shipments that had been covered by the Mount Vernon Requirement (three A4W steam generators). Spot bids are generally utilized in situations where an "as soon as possible" movement is required. Since the Mount Vernon Requirement was rendered inactive because of plaintiff's protest to the GAO and subsequent SBA proceedings, and the second shipment was ready to move and was a "as soon as possible" shipment, it was designated to proceed under the spot bid program.

As noted previously, the issuance of a spot bid was a recognition of the time sensitive and mission critical nature of the items to be shipped. Typically, no pre-award survey is required or performed in conjunction with spot bid solicitations. Therefore, a bidder is required to submit the information usually presented during a pre-award survey at the time it submits its bid. In this case, for example, unlike the Mount Vernon Requirement GT solicitation, the Mount Vernon spot bid solicitation required bidders to "provide with their bid solicitation a statement pertaining to their background and experience over the past five years that is pertinent to the performance of this move," and "information on the availability of personnel, back-up sources to accomplish the move." Additionally, the Mount Vernon spot bid solicitation provided that:

... Barge drawings shall be submitted along with the structural and stability analyses for each shipment. All configurations and analysis shall be presented in a report format to MTMCEA for shipper [Westinghouse] analysis at the same time the carrier submits their bid.

Bidding was opened on January 15, 1998. On that date Lockwood Brothers submitted the low bid in the amount of $129,960.[15] CRC followed with a bid in the amount of $154,900. Attached to CRC's bid were six pages from a Mount Vernon Barge Service, Inc. brochure. These pages plainly do not provide any of the required analysis of the barges CRC planned to use to perform this solicitation or any of the other required information. Calore concedes he did not submit the required analysis with his bid. Transcript of Hearing (Tr.) 243. The two other bids were significantly higher, S.C. Loveland bid $277,433 and Canal Barge Company bid $287,000.

MTMC bid results dated February 6, 1998 listed Loveland as the "Low Cost Carrier/Accepted Tender" with its bid in the amount of $277,433; Lockwood as "Withdrawn From Bid";[16] Calore as "Disqualified"; and Canal Barge Company's bid in the amount of $287,000.

On February 9, 1998, Calore submitted a request to Evert Bono (Bono), Chief, Special Commodities Division, MTMC Bayonne, New Jersey, for a written copy of information on CRC's disqualification. The following day Bono faxed to Calore a January 26, 1998 document on which CRC's disqualification was based. The January 26, 1998 document,

addressing "Barge Shipment Technical Requirements Analysis," was from Michelle Strunks of Westinghouse to Bono. Strunks wrote:

CRC Marine's bid package was found to be incomplete as it did not include an analysis which is required to be submitted with the bid package. *CRC Marine was contacted by phone regarding the missing analysis and they reported that they had done an analysis but the barge analyzed did not meet the requirements.*[17]

Loveland's analysis as submitted with the bid package was found to be acceptable.

(emphasis added). Loveland was accordingly awarded the spot bid contract, on or about February 10, 1998. Loveland successfully performed and completed the contract on April 1, 1998. Plaintiff's contention that its bid on the Mount Vernon spot movement was not fairly and honestly considered has no credible support in the record before the court. The action of MTMC in "disqualifying" plaintiff's bid was reasonable and rational.

3. *Solicitation No. 1NXX 00948N (the "Lynn Requirement")*

On September 22, 1997, Janet Doherty (Doherty), Transportation Officer and Chief, Transportation and Packaging Team, Technical Assessment Group, Defense Contract Management Command (DCMC) Boston, asked MTMC Bayonne to solicit a contract for the transportation, "[a]s soon as possible," of two CVN Reducing Gears/Parts from General Electric Company (G.E.), Lynn, Massachusetts to Newport News Shipbuild-

---

**15.** In its complaint and subsequent submissions, plaintiff mistakenly states it was the low bidder on all three solicitations at issue in this case.

**16.** Bono testified that Lockwood withdrew from the bidding because it determined that it would not have barges available in time for the spot movement. *This testimony was uncontroverted.* Parenthetically, plaintiff argues that Lockwood withdrew because two of the barges it planned to have available for the job failed the analysis. Assuming this to be so, the record does not support inferences plaintiff draws from this assertion in reference to the Mount Vernon Requirement because as plaintiff recognizes in its briefs, barges which fail analysis tests can be worked on to remedy any shortcoming, *e.g.*, rein-

forcing 1/2 inch decks so as to provide support equal to that provided by a 3/4 inch deck.

**17.** At the hearing in this matter, Calore testified that the analysis referred to by Strunks was conducted on the McDonough barge which Calore had intended to use as a back-up for the spot movement. Further, Calore testified that he did submit another analysis for the barge he intended to use for the spot movement. No such analysis is in the Administrative Record nor was one presented at the hearing. There is nothing in the record to suggest that Westinghouse or MTMC received and failed to consider any other analysis that Calore may have submitted relative to the Mount Vernon spot bid.

ing, Newport News, Virginia. In response to Doherty's request, Bono issued Solicitation No. 1NXX 00948N (the Lynn Requirement) on September 24, 1997. Doherty was previously a Transportation Officer in DCMC's Syracuse, New York office and transferred to the Boston office in January 1997. In her previous job she had never worked on barge shipment matters. G.E. was the prime contractor and the manufacturer of the items to be shipped.

The Lynn Requirement solicitation was Doherty's first contract involving a barge shipment. The solicitation required the carrier to provide a "Truck & Covered Barge." The initial request for a "covered" barge was made in Doherty's September 22, 1997 letter to MTMC Bayonne requesting routing for the gears. In her letter, Doherty stated that "Due to highway restrictions and extraordinary weight, the gears can only move via water, and must be loaded on a covered barge." Doherty stated that she did not know what a "covered" barge was or what the term embraced. Indeed, she testified that she only included the term "covered" in her letter because her predecessor had used it for previous barge shipments. A covered barge, also known as a "hopper" barge, provided a covered enclosure on a barge to protect a shipment from the ravages of ocean travel.

On October 7, 1997, prior to bid submission and award, John Schaffner, Lockwood's operations manager, called the Defense Logistics Agency, DCMC Boston asking if shrink wrap could be considered an alternative to a covered barge. Schaffner was told that his request would be looked into. Apparently, DCMC could not provide a clear answer before the bid date and the carriers bid on the solicitation as issued, i.e., with a "covered" barge.

CRC, Lockwood, and S.C. Loveland submitted bids on October 14, 1997. CRC bid $86,000 with a bid expiration date of January 14, 1998. Lockwood and Loveland bid $197,-810 and $353,617 respectively with bid expiration dates of February 14, 1998. MTMC listed the final bidding results on October 14, 1997. CRC was the low bidder at $86,000 and was designated "Low Cost Carrier/Accepted Tender." Lockwood Brothers was the next lowest bidder at $197,810. The last and highest bid was submitted by S.C. Loveland at $353,617. By letter dated October 18, 1997, Bono informed Calore that "[a]s a result of the review of tenders submitted for the transportation of CVN gears, from General Electric Co., Lynn, Massachusetts to Newport News Shipbuilding and Dry Dock, Newport News, Virginia, CRC Marine Services, Inc. has been included in route order 1NXX00948N." The letter further indicated that Roland Tanzi, DCMC Boston was the point of contact person for the movement. Bono had enclosed a document entitled "Uniform Tender of Rates and/or Charges for Transportation Services" (Tender of Rates) for Calore to sign and return within five days of receipt and noted "[f]ailure to do so may result in delay of payment." Calore's signature appears under section 22 of the Tender Agreement.

The shipment was not ready for movement for three months because of manufacturing delays by G.E. There is no evidence in the record to support plaintiff's contention that the government caused the delay. Around mid-January, G.E. advised Doherty that the gears would be ready to ship at the end of February. On or about January 21, 1998 Doherty attended a meeting at G.E. to finalize the details for the movement. During the meeting G.E. representatives expressed to Doherty their disappointment with the selection of CRC as carrier. Doherty stated that "they were very unhappy with [Calore's] past performance; that if [Calore] were to take this shipment, that they would, basically, not have any responsibility for it." Moreover, G.E. expressed its unwillingness to assist with the loading of the gears if CRC was the carrier.[18]

---

18. In plaintiff's brief in support of its motion for a permanent injunction, plaintiff contends that during this meeting with G.E. "Doherty said that she agreed to 'make some phone calls' to see if it was possible to get CRC off the job, and that these calls included her phone calls to Peter DeVeau." Plaintiff has distorted Doherty's deposition testimony on this point. Doherty testified in pertinent part as follows:

Doherty had no independent knowledge of CRC's past performance on barge shipments and was not aware of Calore's past debarment. During the January 28 meeting, however, G.E. representatives told her about a 1989 barge shipment by CRC. This shipment appears to be separate from the 1989 Iuka shipment discussed in footnote 10. The 1989 shipment G.E. referred to allegedly resulted in damage to the Lynn, MA pier when the barge came in at a time other then when it was specified to come in. Additionally, Calore allegedly waited so late in the day to start loading the shipment that they had to complete the loading at night by flashlight. Finally, Calore allegedly failed to provide security for the shipment overnight. G.E. was concerned that because of this incident Calore might not have access to the Lynn pier. Doherty called Peter DeVeau at the Lynn Port Authority for any information he might have about the incident G.E. told her about. DeVeau was uncooperative and told Doherty to look for "dirt" on Calore elsewhere.[19] DeVeau did tell Doherty, however, that Calore paid for the repairs to the pier.

In early February, Bono spoke with Calore and asked him to extend CRC's bid which had, by its own terms, expired on January 14, 1998. At that time Calore stated that the covered barge he intended to use to perform the contract, which was never identified in the record nor was any evidence provided showing that the intended barge was and would be available on the proposed shipping date set forth in the solicitation, was no longer available and that he would have to increase CRC's bid by $20,000 to perform the contract.[20] Bono was of the view he could not increase Calore's bid without subjecting the contract to resolicitation which would impinge on the time constraints of shipping the items. Moreover, Bono did not believe the increase was justified because he thought that other covered barges were available. Since Calore's bid had expired and he would not extend it, Bono awarded the contract to the next lowest bidder, Lockwood, whose bid had not yet expired. Plaintiff suggests that the above scenario bespeaks of efforts to get plaintiff out of the picture. However, a reasoned consideration of the record as a whole shows that bad faith on the part of the government officials was not clearly established and the actions of said officials under the circumstances are deemed reasonable and rational.

When Lockwood was approached about performing the contract under its bid, Lockwood again asked if it could use shrink wrap instead of a covered barge. Doherty's records of phone conversations show that on February 4, 1998 she made a number of calls inquiring into the use of shrink wrap on this contract. First, Doherty called Bono who stated that "as long as it was acceptable by the parties involved, it would not be a problem. He [Bono] indicated that this is a common sense type of movement, and given the time restrictions, it would be justified." Next, Doherty called Dana Jordan of G.E. and Norman Webb of Newport News Shipbuilding. Both agreed to the use of shrink wrap. Consequently, MTMC awarded the contract to Lockwood on February 10, 1998.

It turns out that Doherty had not actually received official approval from the appropri-

---

Q. [by plaintiff's counsel] Okay. Did you, how was the issue left at the meeting as to what to do about the source selection?
A. That was not an issue at the, I mean, it was, it was left that I was going to make some phone calls to get information, and that we were going to proceed. We were, our main concern was meeting, at that point, just meeting the date of the week of February 25th [the shipment date].
Doherty Deposition 15.

19. Plaintiff likewise distorts this testimony in its brief by accusing Doherty of seeking "dirt" about Calore from DeVeau. The word "dirt" was uttered by DeVeau not Doherty. Tr. 506.

20. Plaintiff alleges in its complaint that the covered barge CRC intended to use to perform the transport had been moved by the subcontractor to the Gulf of Mexico for other work. Calore alleges that retrieval of the covered barge would have cost CRC approximately $40,000. Calore felt MTMC should pay for one half of the cost of the return of the barge from the Gulf of Mexico by raising the contract price by $20,000. There is no evidence in the record to support CRC's contention that it could have secured the covered barge in time for the shipment date nor was there any evidence that CRC had a firm written or oral agreement with the owner of the barge to engage the barge at any time significant to the Lynn Requirement.

ate government office, presumably Naval Sea Systems Command (NAVSEA), the buying activity, to authorize the use of shrink wrap. In a February 17, 1998 memo to Mike Dupuis of NAVSEA Doherty explained the confusion about the use of shrink wrap as follows:

> ... Historically movement has occurred on a covered barge. We sent our routing request to the Military Traffic Management Command in September and copied a request that had been used in the past. There were three carriers who bid on the movement, and the low cost carrier was CRC Marine Services. Joseph Calore owns and operates this business, and is currently disqualified from moving Government freight via truck.[21] We had serious concerns about his ability to perform on this movement, but there didn't seem to be anything we could do. The shipment was delayed for 3 months, and during this time period CRC Marine Services rates expired. When we were advised that the gears would be ready to move by the end of February, we contacted MTMC to see what we would need to do to get the routing updated. Mr. Calore stated that he would now need an additional $20,000 to perform the movement. Everett (sic) Bono from MTMC stated that he would not allow this rate increase, and unless Mr. Calore would extend his rates, he would award the shipment to the next carrier on the list; Lockwood Transportation. I contacted John Schaffner of Lockwood Transportation to determine if he could meet the February sailing date. He expressed concern about his ability to obtain a covered barge on such short notice, and suggested an alternative plan. He has been using shrink-wrap on similar movements and has found this level of protection to be quite adequate. I contacted MTMC, General Electric and Newport News Shipbuilding to determine if this would be acceptable. I was given what I thought was approval from the government. I discovered sever-

al days later, that the approval actually came from an engineer at Newport News. We are now facing a delay of 5 weeks at a minimum if a covered barge is going to be required. At our meeting last week, the issued (sic) of shrink-wrap was discussed. General Electric has moved gears to San Diego via barge in the past using this method of preservation. The barge sailed around South America and back up to San Diego with no damages to the gears. This movement will take only 3 days, and will be on open water for only a small portion of the movement. I personally do not have any expertise to offer here, but the consensus in the meeting from the "experts" was that this is a very low risk situation. The only concern was that sharp comers need to be padded prior to shrink wrapping in order to avoid tearing. Mr. Schaffner intends to tarp the gears and then place a net over the tarp to hold it in place.

Dupuis, NAVSEA's Assistant Program Manager for CVNs 75 and 76 (the type of gears involved in this contract) responded on February 25, 1998 as follows:

> ... With regards to protection during shipment, I have been advised that a covered barge approach has been used in the past, but the method intended for use by the shipper of the CVN 76 main reduction gears will be a shrink-wrap method, with added protection of padding at sharp corners to prevent tearing of Shrink-wrap and then the use of tarps with nets over the gears. This method has been used with success by this shipper on similar movements.

> ... I concur in the method of protection to be used by the shipper, as discussed above. I have discussed the purpose and details of this memo with the NAVSEA Contracting Officer for the CVN 76 shipbuilding contract.

---

**21.** Doherty mistakenly assumed that Calore was the owner of Calore Freight Systems. As noted earlier, Calore transferred his interest in Calore Freight Systems to his four sons in 1985, one of whom is named Joseph C. Calore, Jr. At the hearing, Doherty conceded that she had made a mistake in identity in this regard. Viewed in the prism of the total record, this mistake is deemed harmless error and in no way impinged on plaintiff's failure to be awarded the Lynn Requirement.

This contract was subsequently successfully performed and completed by Lockwood during the last week of March 1998.

## DISCUSSION

■ The critical theme advanced by plaintiff relative to the three solicitations discussed above is that as low bidder on these solicitations it was entitled to be awarded contracts to perform the services required by these solicitations. Applicable regulations, however, make it clear that submitting the lowest bid does not necessarily guarantee that a contract will be awarded. FAR § 9.103(c) provides:

The award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional contractual or administrative costs. While it is important that Government purchases be made at the lowest price, this does not require an award to a supplier solely because that supplier submits the lowest offer. *A prospective contractor must affirmatively demonstrate its responsibility,* including, when necessary, the responsibility of its proposed subcontractors.

(Emphasis added). Thus, a prospective contractor is not entitled to contract award merely because it is the low bidder. The prospective contractor must also prove that it is capable of performing the contract. The above observation is particularly relevant to the Mount Vernon Requirement solicitation.

■ In reviewing an agency's procurement actions, the agency is given wide discretion in the evaluation of bids and in the application of the procurement regulations. *Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988); *CACI Field Services, Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). "There is ... a strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 663, 671 (1997). Therefore, the court cannot substitute its judgment for that of the agency if reasonable minds could reach differing conclusions but must give deference to the agency's findings and conclusions. *IMS Services, Inc. v. United States,* 33 Fed.Cl. 167, 179–80 (1995); *Health Sys. Mktg. & Dev. Corp. v. United States,* 26 Cl.Ct.1322, 1326 (1992). Specifically:

The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations.

*Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). Thus, the court's standard of review is extremely limited. Specifically, an agency's procurement decisions will be upheld unless the plaintiff can demonstrate that the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see also* 28 U.S.C. § 1491(b)(4). The arbitrary and capricious standard is highly deferential and assumes the validity of agency action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys. Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

■ The Court of Claims, in *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974), set forth four factors to be considered when determining whether the government has acted arbitrarily or capriciously towards a plaintiff: (1) whether there was subjective bad faith on the part of the procuring officials, thus, depriving the bidder of fair and honest consideration of its proposal; (2) whether there was a reasonable basis for the administrative decision; (3) the degree of discretion given to the procurement officials by applicable statutes and regulations which, under *Keco,* determines the degree of proof necessary to demonstrate a right to recovery; and (4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the

basis for recovery, but do not do so automatically. *Id.* at 574, 492 F.2d at 1203–04.

▆ Generally, where agency action has been challenged, court review is limited to the existing administrative record. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). In certain limited circumstances, however, supplementation of the administrative record may be permitted. Exceptions to the general rule have been recognized under the following circumstances:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) *citing Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989). In this case, plaintiff was afforded discovery and a hearing to consider its allegations that it had been *de facto* debarred from being awarded contracts by MTMC.

▆ As noted earlier, plaintiff contends that the government's decision to award the contracts at issue to offerors other than CRC constitutes an unlawful *de facto* debarment. The elements necessary to establish a *de facto* debarment claim are not clearly defined. Case law indicates, however, that at the least, a disappointed bidder must show evidence "of a systematic effort by the procuring agency to reject all of the bidder's contract bids." *Stapp Towing Inc. v. United States,* 34 Fed.Cl. 300, 312 (1995). Plaintiff may show this by evidence of an agency's statement that it will not award any contracts to the bidder in the future as well as by an agency's conduct to that effect. *Leslie*

*and Elliott Co., Inc. v. Garrett,* 732 F.Supp. 191, 195 (D.D.C.1990). For example, in *Related Indus., Inc. v. United States,* 2 Cl.Ct. 517, 525 (1983), the court held that the contracting officer's statement that under no circumstances would he award the plaintiff any contracts, amounted to a *de facto* debarment. There is not a single instance in the record indicating that any MTMC official or employee or any SBA official or employee suggested, inferred or implied that plaintiff would not be awarded any contract by MTMC at the present or in the future or that plaintiff's prior debarment would preclude it from receiving any contracts.

In the case at bar, plaintiff contends that the Administrative Record shows that MTMC's decision to award the three contracts to other offerors was based on Calore's prior debarment. Plaintiff states that "the Government *de facto* debarred CRC and Mr. Calore by improperly denying him three consecutive contracts because of highly stigmatizing past performance information that was unreliable and outdated." Before proceeding any further, the court must emphasize that it is not reviewing the merits of Calore's prior debarment. The court will note, however, that Calore was in fact debarred and that he did not contest that debarment. Hence, the fact of his debarment cannot be considered "unreliable" as plaintiff contends.

Plaintiff alleges a number of facts that it contends supports its claim that it has been *de facto* debarred from the three contracts at issue. In sum, most of what plaintiff alleges as fact is unsupported by the Administrative Record and the subsequent testimony.

### 1. The Mount Vernon Requirement

▆ Plaintiff's first contention with respect to the Mount Vernon Requirement is that Barbaro, the contracting officer, based her finding of CRC's nonresponsibility on Calore's prior debarment. This contention is not supported by the Administrative Record and is contradicted by Barbaro's testimony that she did not know about Calore's debarment until the time of the COC application.

Plaintiff next attacks the merits of Barbaro's nonresponsibility determination. Para-

graph 12 of plaintiff's amended complaint states in pertinent part:

> [MTMC's November 18, 1997] rejection letter's allegations were false in virtually every respect. Mr. Calore had obtained signed commitment agreements from all his subcontractors, had obtained a performance bond, and had supplied his interviewers with the plans and specifications for his proposed barge. Most glaring, however, was the Contracting Officer's erroneous suggestion that Mr. Calore had not shown evidence of his company's "recent background in performing shipments of a similar nature." In reality, Mr. Calore had been "performing shipments of a similar nature" for MTMC for 40 years. The Contracting Officer had raised none of these concerns at the "pre-award survey." CRC had satisfactory answers on each of these issues, but had never been given the opportunity to provide them.

Plaintiff has failed to prove any of the allegations quoted above. Moreover, the court finds adequate support in the record for MTMC's conclusion that CRC was not "presently responsible to handle the subject movement." Calore's testimony on most matters was vague, confusing, and at times inconsistent. Accordingly, the court gives more weight to the contemporaneously recorded documents that are in the Administrative Record. *See Spence v. United States,* 140 Ct.Cl. 362, 366, 156 F.Supp. 556, 558 (1957) (according more weight to contemporaneously executed documents than to the inconsistent testimony of witness). For example, with respect to having obtained signed commitment agreements from his subcontractors, Calore testified:

> Q. Now, with regard to the barges that you did propose to lease, the Cashman barges, did you have an agreement that you had made for their charter at this point?
>
> A. I did.
>
> Q. [By the court] In writing?
>
> A. No, oral. At that time, oral.

Tr. 133. Later, on cross-examination, Calore testified:

> Q. But you didn't provide any agreements of—any firm agreements with

subcontractors at the pre-award survey meeting to MTMC, did you?

> A. I was there with them. I had them. I had them at the meeting, of course.

Tr. 226. Likewise, Calore's testimony with respect to providing the specifications for the barges he proposed using to perform the Mount Vernon Requirement is inconsistent. In its complaint plaintiff states Calore "had supplied his interviewers with the plans and specifications for his proposed barge." At the hearing, Calore testified that he proposed using Cashman barges to perform the move. When questioned about the sole document that he submitted at the pre-award survey, which pertained to a barge that he had testified was a backup (Tr. 122), the "Witte 106," Calore admitted that the document he submitted did not contain any specifications at all. Tr. 229. Finally, Calore's testimony confirms Barbaro's statement that Calore had not shown evidence of CRC's "recent background in performing shipments of a similar nature." Calore admitted that he had not performed any moves of a similar size since his debarment ended and that none of the moves he performed in 1997 originated in Mount Vernon. Tr. 92.

Without support for its main contention, i.e., that Barbaro was prejudiced by Calore's prior debarment, plaintiff, citing *Related Indus., v. United States,* 2 Cl.Ct. 517, 527 (1983), next argues that it "was improper and unlawful for MTMC to forward decade-old stigmatizing documents about Mr. Calore's past performance to the SBA in connection with the COC determination." First, *Related* provides no support for this proposition. Second, Roncaglio unequivocally testified that Calore's debarment played no part in his recommended denial of CRC's COC application. Assuming, *arguendo,*[*] that it was unlawful and improper for Barbaro to forward Calore's debarment information, the testimony indicates that her action had no impact on CRC's competency determination. It was to say the least harmless error, if indeed it was an error. While the incidents which gave rise to the past debarment occurred in the late 1980s, the debarment flowing therefrom ran from April 1, 1992 to April 29, 1996. Thus, the debarment ended less than a year

and a half from the issuance date of the Mount Vernon Requirement solicitation. For some eight years, plaintiff had no work performance history. At the pre-award survey, Calore talked about his experience in performing barge contracts in the mid and late 1980s. The debarment was not contested. It is a historical fact. The fact of debarment for some four years explains clearly why plaintiff lacked a significant performance history for the past five years. The record supports the finding that the debarment material was utilized to explain the spotty work performance history and played no significant role, if indeed any role, in the determination of whether plaintiff could responsibly perform the solicitation in issue.

Plaintiff also contends that MTMC's January 2, 1998 referral letter to the SBA is evidence that Calore's debarment was the basis for MTMC's decision to not award the Mount Vernon Requirement to Calore. The letter, drafted by Barbaro, provides in pertinent part:

> Enclosed is information in our files indicating Mr. Joseph Calore's past performance when operating under one of his previous company names, Calore Rigging Corporation. As you can see past performance was lacking in previous efforts. We therefore, strongly believe he is not competent to handle the time-sensitive job on which he bid.

Plaintiff argues that the language quoted above "states categorically that MTMC considers Mr. Calore to be 'not competent' and therefore unfit to perform contracts for MTMC." Further, plaintiff adds "the letter unambiguously shows that MTMC intends to use Mr. Calore's prior debarment against him indefinitely." The court disagrees with plaintiff's interpretation of this letter. First, MTMC's November 18, 1997 letter to Calore informing him that MTMC determined that he was "not presently responsible to handle the subject movement" did not mention the debarment. The focus of that letter, as discussed earlier, was Calore's presentation at the pre-award survey. Indeed, there is no

evidence in the record indicating that anyone at MTMC involved with the Mount Vernon Requirement knew about Calore's debarment when Calore was found not responsible. Barbaro testified that she first learned about the debarment in late December 1997 when MTMC's legal counsel gave her the file with the debarment information to forward to the SBA. Her testimony was uncontroverted and deemed credible by the court. Second, the January 2, 1998 referral letter, as does the November 18 nonresponsibility letter, clearly states that MTMC's determination pertained only to the Mount Vernon Requirement. It certainly does not support plaintiff's allegation that he was *de facto* debarred from all future MTMC procurements. Indeed, subsequent to the termination of Calore's debarment in April 1996, he has been awarded contracts by MTMC. Consequently, the court finds that Calore's debarment was not a factor in MTMC's determination of Calore's nonresponsibility for the Mount Vernon Requirement, and is not being used to deny him further MTMC procurements. Calore has conceded that no one at MTMC or the SBA ever told him he would not be considered for future contracts. Tr. 245. *See PNM Constr., Inc. v. United States*, 13 Cl.Ct. 745, 749 (1987) (rejecting claim of *de facto* debarment when there was no statement by any government official that the plaintiff would be denied future contracts and the plaintiff had been awarded contracts subsequent to the bid protest).

### 2. The SBA's Certificate of Competency Determination

■■■ Plaintiff asserts that Calore's debarment was the basis for the SBA's denial of his COC application.[22] To support its contention, plaintiff directs the court to loan officer Lavin's financial report recommending that the COC Committee "decline" CRC's application. Specifically, plaintiff relies on the following language which appears in Lavin's report under the heading "CREDIT ANALYSIS":

> without merit. Plaintiff had a full opportunity to challenge the debarment action when it occurred. Calore chose not to contest the proceedings against him and was accordingly debarred.

---

22. Plaintiff also argues that it was *de facto* debarred because MTMC and the SBA never gave Calore an opportunity to respond to the debarment information in his file. This argument is

Of great concern is the history of debarment, which supersedes the financial information in this recommendation. As it impacts analysis, the debarment coupled with the substandard financial reporting indicates that this is not a prudent bid, either for the government or the SBC [CRC] (i.e. if performance penalties are imposed). This is a particularly time-sensitive and mission-critical contract, involving the transport of nuclear equipment. There is no evidence submitted to support the financial capacity of the SBC to successfully perform the work.

Plaintiff contends that Lavin's report is the "smoking gun" in the SBA record, proving that because of Calore's debarment, CRC never had a chance of obtaining a COC.

Plaintiff argues that Lavin's use of the word "supersedes" proves that the SBA considered Calore's debarment to be pivotal in determining CRC's nonresponsibility. At first glance, Lavin's mention of the debarment gives one pause. However, it is not unreasonable to interpret Lavin's comment that the history of debarment supersedes CRC's financial information as simply stating a fact. That is, Calore's debarment, which had ended not even one year and a half prior to CRC's COC application, explained why CRC had no recent financial history or records to rely on. Even assuming for a moment that Lavin was for some reason prejudiced against Calore because of his debarment, it is important to note that Lavin only submitted his recommendation and he was not a member of the COC Committee. Moreover, Lavin's supervisor concurred in his assessment that the financial information CRC provided was inadequate. Roncaglio testified that Calore's debarment did not factor into his recommending that the COC Committee deny CRC's COC application. The COC Review Committee's minutes from its January 21, 1998 meeting do not mention Calore's debarment at all.

Plaintiff also gives great weight to Lavin's observation that the contract involved the transport of nuclear equipment. Lavin's comment is "revealing," plaintiff contends, because it shows that the SBA analogized this contract to the 1989 incident resulting in Calore's debarment which also involved nuclear equipment. Again, plaintiff speculates; it is not unreasonable to assume that Lavin is simply stating a fact about the Mount Vernon Requirement. Plaintiff argued to the court that the Administrative Record in this case is incomplete. Indeed, plaintiff asserted that the Administrative Record is inaccurate and that the all the explanations the government has provided belie the real reason for not awarding Calore the three contracts at issue. Therefore, the court allowed plaintiff to engage in limited further discovery. Although plaintiff contends that Lavin's report is the "smoking gun" in this case, it never deposed or called him as a witness. Instead, plaintiff asks the court to speculate on what plaintiff claims is one of the most important pieces of evidence in this case. Accordingly, plaintiff has failed to establish that the SBA considered Calore's debarment a significant factor in its COC determination.

■■■ Next, plaintiff attacks the reasonableness of the SBA's denial of its COC application and contends that the SBA's assessment of CRC's capabilities was arbitrary and capricious. The arbitrary and capricious standard is highly deferential and assumes the validity of agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys. Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *IMCO, Inc. v. United States*, 33 Fed. Cl. 312, 317 (1995). Bearing this standard of review in mind, the court will turn to some of those points on which plaintiff asserts Roncaglio's assessment of CRC was "flatly and demonstrably incorrect."

In his report, Roncaglio stated that CRC "has failed to evidence firm agreements for the acquisition of barges that meet MTMC requirements." Plaintiff contends that the Administrative Record "completely discredits" this finding. The court disagrees. The COC APPLICATION INSTRUCTION SHEET, which plaintiff does not dispute it received, required plaintiff to provide information on seven technical items and five

financial items in triplicate. The first item on the list was "SUPPLIER AND SUB-CONTRACTING INFORMATION." Pursuant to this item plaintiff was to "[s]ubmit quotations from principal suppliers and sub-contractors indicating firm delivery times, quantity, price and terms of payment. Quotations must be current." In response to this requirement, plaintiff had Mike Shea of Cashman Equipment Corporation (Cashman) fax to Roncaglio three pages of documents consisting of delivery dates and specifications for two barges Calore proposed using to perform the Mount Vernon Requirement. The documents indicated that one barge was due to be completed by March 15, 1998, the other by June 15, 1998.[23] The first shipment under the contract was scheduled for February 13, 1998. Although the fax cover sheet stated that "Joe [Calore] and C.E.C. [Cashman] have worked together for 12 to 15 years. With tug and barge movements. All job[s] have been successful. And look forward to this new job with Joe," the fax is otherwise not responsive to the above mentioned COC APPLICATION requirement. No firm delivery time is indicated, no price is listed nor are the terms of payment. Roncaglio testified that he did not consider this submission to be evidence of a firm commitment. The court finds his conclusion reasonable.

Plaintiff also criticizes Roncaglio for faulting Calore for "not having his [Calore's] naval architect, Peter Ebbutt [Peter Ebutt is president of Ocean Motions], run specialized calculations to ensure that the Cashman barges were actually strong enough." In support of this point, plaintiff contends that the solicitation did not require those calculations to be performed until after a carrier is selected for award. Plaintiff then suggests that if Roncaglio had only asked Calore, Calore would have "spent the several thousand dollars required to have them done." Before reaching the question of whether the solicitation required these calculations during the pre-award stage, the court notes that previously in its litigation relative to the Mount Vernon Requirement plaintiff adopted the contrary position and claimed that such specifications had been prepared. In its December 2, 1997 protest letter to the GAO, plaintiff, represented by the same counsel appearing in the instant case, stated as follows:

Mr. Calore's interviewers did not request any other information from him during the pre-award survey. Nevertheless, as required by the Solicitation, Mr. Calore had [ ] a naval architect, Peter Ebert (sic), prepare specifications for modifying his barges to meet or exceed the weight requirements of the Solicitation, and he gave his interviewers a copy of those specifications. Several days later, Mr. Calore's naval architect contacted the Contracting Officer to see if she had any questions over his plans, but she advised him that no plans would be required until after contract award, as stated in the solicitation.

As noted earlier, the only document Calore submitted to Barbaro during the pre-award survey was Ocean Motion's quotation of how much it would cost to perform the necessary calculations on the "Witte 106," which Calore testified was a back-up barge. Roncaglio's report states that he spoke with Ebutt on January 13, 1998 and learned that Ebutt had not performed the calculations and had never done business with Calore before. At best, the record is conflicting on this point. The totality of the record, however, supports Roncaglio's account of the matter.

With respect to plaintiffs current contention that the solicitation did not require CRC to perform a pre-award analysis demonstrating barge suitability, the court disagrees. Plaintiff argues that it was not required to submit a barge analysis until 30 days after contract award. This contention is nonsensical. It would be extremely foolhardy and counter to common sense for the government to award a contract for the shipment of expensive nuclear reactors and steam generators to a carrier who had not demonstrated that its equipment was suitable for the move.

---

23. At the hearing, Roncaglio noted that construction delays could occur which could push the availability dates of the barges beyond the scheduled completion dates. Too, the barges had to undergo water trials and licensing tests which could further delay barge availability for another thirty days.

Plaintiff's reading of the solicitation's "EQUIPMENT REQUIREMENTS" is too narrow. More accurately, it is incomplete. Paragraph "a" under "EQUIPMENT REQUIREMENTS" provides in pertinent part:

> ... If carrier provides other than a Loveland 1721 series barge *they must go through a pre-award design analysis to prove the barge and its internal members are structurally acceptable to carry the intended load.* The analysis will be submitted to HQMTMC. The loaded barge must be shown to be stable when loaded.... A naval architect or marine engineer must certify to the structural and stability acceptance of each shipment configuration before the first shipment is made. Barge drawings shall be submitted along with the structural and stability analyses for each shipment. *Configuration shall be presented in a report format to the shipper no later than 30 days following notification of acceptance of the awarded agreement.*

(Emphasis added). Plaintiff relies on the last sentence quoted above. The court reads this paragraph as requiring a pre-award analysis of the structural suitability of the proposed barges themselves to be submitted to MTMC *and* a separate report on each shipment configuration to be submitted to the shipper, i.e., Westinghouse, within thirty days after contract award. Accordingly, Roncaglio's understanding of the solicitation's requirements was reasonable and not, as plaintiff argues, incorrect.

Next, plaintiff contends Roncaglio incorrectly read the solicitation to prohibit "tandem towing." Roncaglio, relying on the solicitation's "SPECIAL REQUIREMENTS" provision stating "Carrier must provide exclusive use of tug and barge from the origin to the destination" and Barbaro's subsequent verification of that provision, concluded that CRC's proposed use of Nemco Tug and Barge Service to perform a fleet tow would violate the terms of the solicitation. Plaintiff ignores this requirement of the solicitation and instead directs the court to Item 940 of MTMC's Guaranteed Traffic Rules Publication No. 50, incorporated by reference into the solicitation, which plaintiff argues permits "tandem towing." Item 940, "TANDEM–TOWS" provides, "Tandem-tows will each move on one GBL with a stopoff and/or pickup when necessary. Tandem-tows at all times will be considered as one single shipment from one origin to one destination via the stopoff point for payment purposes." While this provision does indicate that tandem tows may occur on some government Guaranteed Traffic contracts, the same Rules also make it clear that Item 940 does not apply to the Mount Vernon Requirement. Under the heading "PURPOSE AND APPLICATION" the Rules provide that "the provisions provided herein govern tenders making reference to this publication and take precedence over all other rules, regulations, charges, or provisions named in other publications, *except as otherwise provided in a GT solicitation.*" (Emphasis added). Thus, the solicitation's specific requirements take precedence over a general regulation. Accordingly, the court finds that it was reasonable for Roncaglio to conclude that Calore's proposed use of Nemco Tug violated the terms of the solicitation.

An often repeated complaint by plaintiff is that Roncaglio never asked for additional information or sought clarification from Calore with respect to CRC's COC application. The court finds no merit to this complaint. In *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231 (1994), the plaintiff therein made a similar argument to the court when challenging the SBA's denial of its COC application. The court dismissed plaintiff's argument as follows:

> ... [P]laintiff and its attorney, who assisted in the submission of the COC application, seem to ignore two critical facts. First, plaintiff bears the burden of establishing responsibility. FAR § 9.103(c). Second, the SBA must issue a COC decision within 15 days of receiving the contracting officer's referral. 13 C.F.R. § 125.5(d); FAR § 19.602–2(a). Plaintiff's burden includes providing the most accurate, current, and complete information. This information is particularly important, given that the SBA is allowed only 15 days to make a final, binding, and conclusive COC determination as to a prospective contractor's responsibility. The SBA can-

not be required to request additional information when the applicant simply did not put forth the requisite effort to complete satisfactorily the COC application.

*Id.* at 246. In the case at bar, Roncaglio, after receiving plaintiff's application, called Calore and told him that what he had submitted was inadequate and gave Calore an opportunity to submit additional information. Plaintiff has failed to put forth any evidence indicating that Roncaglio's review of its COC application was arbitrary and capricious. On the contrary, it appears that Roncaglio treated plaintiff's application as fairly and honestly as he would treat any other contractor's application submitted for his review. Plaintiff's attack on Roncaglio's role in the COC application process has been given careful consideration. Whatever inconsistencies, uncertainties, and confusion exists in this area rests primarily with plaintiff. It was his responsibility to demonstrate competency to perform the work required by the solicitation, and he was so warned. If as plaintiff suggests, Roncaglio did not understand the nuances of barge travel, plaintiff must bear most of the responsibility for this. Roncaglio gave plaintiff every opportunity to demonstrate his capacity to perform the solicitation in issue. It was not Roncaglio's responsibility to make plaintiff's case for it. *See C & G Excavating*, 32 Fed.Cl. at 246.

### 3. The Mount Vernon Spot Bid

■ The Mount Vernon Spot Bid was for the second of the guaranteed traffic moves that initially had been part of the Mount Vernon Requirement. As noted earlier in this opinion, while the Mount Vernon Spot Bid solicitation requirements were similar to the main solicitation requirements, bidders were required to submit certain information and specifications along with their bids. In particular the solicitation required that:

Barge drawings shall be submitted along with the structural and stability analyses

for each shipment. All configurations and analysis shall be presented in a report format to MTMCEA for shipper analysis *at the time the carrier submits their bid.* (Emphasis added). The only attachment to CRC's bid consisted of several pages from a Mount Vernon Barge Service, Inc. brochure. These pages contained no barge analysis. Thus, CRC's bid was nonresponsive. When the bid results were published on February 6, 1998, CRC's bid was listed as "DISQUALIFIED." Plaintiff argues that MTMC's listing of CRC as "DISQUALIFIED" is firm evidence CRC's *de facto* debarment. The Administrative Record, however, bears out that MTMC disqualified plaintiff's bid because it was nonresponsive to the Mount Vernon Spot Bid solicitation. Plaintiff was not disqualified from bidding on or performing other government contracts nor was it *de facto* debarred from the spot bit solicitation.

Three days after bid opening Calore wrote Bono requesting a written explanation for CRC's disqualification. Bono responded by faxing to Calore a copy of a January 26, 1998 letter from Michelle Strunks of Westinghouse about the "Barge Shipment Technical Requirements Analysis." Strunks' letter informed Calore that his bid was rejected because:

CRC Marine's bid package was found to be incomplete as it did not include an analysis which is required to be submitted with the bid package. CRC Marine was contacted by phone regarding the missing analysis and they reported that they had done an analysis but the barge analyzed did not meet the requirements.

It is clear that the term "DISQUALIFIED" as used in the bid results meant that a carrier would not be considered for traffic under that particular solicitation if the carrier's bid was not in compliance with the requirements of the solicitation.[24] CRC's bid did not contain a barge analysis which was

---

24. The solicitation for the Mount Vernon Requirement, under the heading "CARRIER PRE-QUALIFICATION," included the following warning to bidders:

Carriers will not be considered for traffic under this solicitation, or will be removed from traffic award if any of the following conditions occur: a Headquarters (HQ), MTMC Carrier Re-

view Board action prohibits a carrier from handling DOD freight of the type described in this solicitation; a carrier is disqualified or placed in a nationwide nonuse status, *or if a carrier is not in compliance with any other requirements of this solicitation.*
(Emphasis added).

required by the solicitation to be submitted with its bid package. Tr. 243. Since CRC did not provide such an analysis, its bid was considered "DISQUALIFIED" for consideration relative to the solicitation in question. Plaintiff attempts to read into the use of the word "DISQUALIFIED" the implication of *de facto* debarment and bad faith. There is absolutely no basis in this record supportive of any such implications.

Plaintiff attempts to link Calore's past debarment to MTMC's rejection of CRC's bid on the Mount Vernon Spot movement by pointing out that Barbaro forwarded CRC's file, *including the debarment information*, to Bono. As proof of the influence the debarment materials had on Bono, plaintiff states that "[w]hen asked to identify an instance of poor past performance by Mr. Calore, Bono cited the very same incident that was described in the suspension and debarment documents sent by Cynthia Barbaro to the SBA." Plaintiff then quotes from Bono's deposition testimony where he discussed the 1989 Iuka shipment. Bono's testimony, however, clearly shows that he had independent knowledge of the Iuka shipment because Bono wrote and monitored that solicitation. At the hearing, Bono testified that Calore's performance on the Iuka shipment had no bearing on whether Calore got the Mount Vernon spot movement. In fact, Bono testified that he was "surprised" when he learned that CRC was not awarded the spot movement because he believed that Calore usually performed quite well on the smaller movements.

The court concludes that there is no merit to plaintiff's claim that it was *de facto* debarred from the Mount Vernon spot movement. Plaintiff's bid was rejected not because it was incapable of performing the contract but because plaintiff simply failed to meet the solicitation's requirements. Plaintiff has failed to prove that its bid received anything less than the fair and honest consideration it was due.

### 4. The Lynn Requirement

The final solicitation at issue is referred to by the parties as the Lynn Requirement. On September 22, 1997, Janet Doherty (Doherty) of Defense Contract Management Command (DCMC) Boston, submitted a "Domestic Routing Request" to MTMCEA to provide "land/water routing" for the transportation of two gears from a G.E. facility in Lynn, Massachusetts to Newport News, Virginia, to be utilized in the construction of the aircraft carrier *Ronald Reagan.* Accordingly, on September 24, 1997, MTMCEA issued a solicitation under its "spot bid program" for the shipment of the two gears "[a]s soon as possible." Bid opening was on October 14, 1997; CRC was designated "Low Cost Carrier/Accepted Tender" with a bid in the amount of $86,000.[25] Lockwood's bid in the amount of $197,810 was the next lowest bid followed by S.C. Loveland's bid in the amount of $353,617.

As discussed earlier, Lockwood, not CRC, eventually performed the Lynn Requirement. Plaintiff argues that "CRC did not perform the Lynn Requirement solely because Janet Doherty did not want Mr. Calore on the job." Government employees are entitled to a presumption that they are acting conscientiously. *See Librach v. United States,* 147 Ct.Cl. 605, 612, 1959 WL 7633 (1959). "A finding of bad faith requires 'well-nigh irrefragable proof' in order for the court to abandon the presumption of good faith dealing. . . . . The necessary and almost irrefutable proof has been equated with evidence of a '*specific intent to injure the plaintiff.*'" *Haney v. United States,* 230 Ct.Cl. 148, 152, 676 F.2d 584, 586 (1982) (quoting *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954), and *Kalvar Corp., Inc. v. United States,* 211 Ct.Cl. 192, 198–99, 543 F.2d 1298, 1302 (1976)). The court finds no support in the record for plaintiff's contention that it was the victim of bad faith maneuvering on the part of Doherty. Rather, it is apparent that CRC did not perform the contract because of a combination of factors, including the unexpected de-

---

**25.** At the hearing, Doherty testified that in addition to the concerns G.E. had raised about Calore's access to the Lynn pier, there were sugges- tions that Calore was bidding 1986 prices for the 1997 Lynn Requirement.

lay in getting the gears ready to ship, the expiration of CRC's bid, and CRC's subsequent refusal to extend its bid without increasing the bid price.

Generally, when the government issues a solicitation under its spot bid program it seeks a one-time arrangement for the movement of property from one location to another. A "[s]pot movement is a one-time movement requirement of any quantity made in a single trip or consecutive trips not covered by a contract or long-term tender. The spot movement is routed on a Domestic Route Order (DRO) and is accomplished, normally, within 30 days but does not exceed 90 days." *Port Arthur Towing Co.,* 89–3 B.C.A. (CCH) ¶ 22,004 at 110,630, 1989 WL 74396 (A.S.B.C.A. May 17, 1989) (decision on jurisdiction), *appeal denied,* 90–2 B.C.A. (CCH) ¶ 22,857, 1990 WL 101360 (A.S.B.C.A. April 12, 1990) (decision on merits). Under spot bid solicitations, the tender is viewed as a continuing offer to perform transportation services, and the issuance of a Government Bill of Lading (GBL) is viewed as the basic transportation contract. A GBL is the basic procurement document used by the government for acquiring transportation services from common carriers under section 321 of the Transportation Act of 1940, which authorizes the procurement of transportation services at published rates from any common carrier lawfully operating in the territory where such services are to be performed. 49 U.S.C. § 10721. *Matter of Sam Trucking,* B–229890, 88–1 CPD ¶ 425 (1988). Spot movement contracts are expressly exempt from the FAR and are not subject to the Comptroller General's bid protest jurisdiction under the Competition in Contracting Act. A spot movement is not subject to the Contract Disputes Act of 1978(CDA), 41 U.S.C. §§ 601–613. *See generally, Dalton v.*

*Sherwood Van Lines,* 50 F.3d 1014, 1019 (Fed.Cir.1995).[26]

Exceptions to the general rule that a GBL constitutes the contract, have been found when the tender agreements appear to be more like requirements contracts. *See A–Transport Northwest Co., Inc. v. United States,* 27 Fed.Cl. 206, 215 (1992), *aff'd,* 36 F.3d 1576, 1584 (Fed.Cir.1994). In *A–Transport,* MTMC publicly solicited tenders for the scheduled moves of perishable goods to government facilities in the Northwest. The tenders were to be effective for a period of two years. Shortly after the government accepted A–Transport's tender, the government asked A–Transport to agree to schedule changes at no cost to the government. A–Transport refused to agree, and the government resolicited. A–Transport then filed suit in this court, on the grounds that the resolicitation constituted a breach of A–Transport's existing contract. *Id.* at 1578–79. In affirming this court's ruling in favor of A–Transport, the Federal Circuit recognized the "general proposition that a tender for transportation services is normally completed through the issuance of a bill of lading." *Id.* at 1584. Nevertheless, the court held that on the specific facts of that case, the government's acceptance of the plaintiff's tender gave rise to a binding contract. Specifically, the court held that after A–Transport signed the solicitation agreement including the following clause by which it offered to provide "the transportation services herein described on a continuing basis for the period shown on the title page of this Tender [January 1, 1987 through December 31, 1988], subject to the rates and charges, rules and provisions herein," the government entered into a contract when it notified A–Transport that their tender had been accepted. *Id.* at 1581. Additionally, the court found mutuality of consideration because the tender agree-

---

**26.** The Federal Circuit's holding in *Dalton* was a narrow one, limited to those cases where the GBL constitutes the contract between the parties. The court specifically left unanswered the question of whether the FAR and CDA applied to those cases where the tender agreement constituted the contract between the parties. *See, e.g., A–Transport Northwest Co. v. United States,* 36 F.3d 1576 (Fed.Cir.1994) (discussed in the main text above); *Matter of Federal Transport, Inc.—*

*Request for Reconsideration,* 68 Comp.Gen. At 452 (selection of a carrier under guaranteed traffic program created a requirements contract with carrier). The court further explained that the smaller and simpler transactions effected by a GBL are better suited to the informal administrative procedure of the agency and the pertinent transportation regulations than to the more formal procedures of the CDA. *Id.* at 1019.

ment included a clause which provided that the carrier was entitled to all available military requirements for the period of the tender. Thus, the court held that the tender agreement was essentially a conventional requirements contract. *Id.*

Similarly, the Armed Services Board of Contract Appeals (ASBCA), in *Port Arthur,* rejected the government's argument that the tender at issue was to be accomplished through a GBL. The ASBCA noted that the tender contemplated a transaction over a twelve month period with flat monthly rates for specific equipment; encompassing recurring moves over the long term; that the procurement was accomplished using procedures similar to the FAR procedures; and the tender had all the indicia of a contract. 89–3 B.C.A. ¶ 22,004, at 110,629. Consequently, the ASBCA concluded:

> We find no merit in the Government's argument that because GBLs are involved in this appeal, they represent the contract and we have no jurisdiction. Far from the case in one-time spot movements where GBLs are issued ... and represent the contract, the GBLs in this tender are merely part of the payment scheme. We know of no authority that prohibits the use of GBLs in conjunction with contracts.

*Id.* at 110,629–630.

Bearing in mind that "there is no definitive statement about when a tender can become a binding contract on the parties," *A–Transport,* 36 F.3d at 1584, the court finds, based on a review of the facts in the instant case, that the Lynn Requirement solicitation was a typical spot bid solicitation requiring the government's issuance of a GBL to complete the contract. Unlike the tenders in *A–Transport* and *Port Arthur,* the Tender of Rates in the instant case contemplated a single move to be accomplished within a short period of time. Because CRC's tender had expired by the time the gears were ready to ship, and CRC would not extend its tender, MTMC could not issue a GBL.[27] Assuming, for arguments sake, that a contract was formed by

MTMC's acceptance of CRC's tender, that contract expired, by its own terms, on January 14, 1998, before the gears were ready for shipment. Thus, at the time the gears were ready for shipment, no agreement existed between CRC and MTMC, i.e., Calore was under no obligation to perform and MTMC was under no obligation to use CRC as a carrier.

Although plaintiff's bid had expired on January 14, 1998, Lockwood's and S.C. Loveland's were still in effect until February 14, 1998. Nevertheless, Bono met with Calore at or near the end of January 1998, to discuss the possibility of Calore extending his bid. Calore would only agree to extend his bid if Bono would allow him to increase the price of performance by $20,000 to compensate for the delay in shipment. Bono refused to agree to such an increase and subsequently awarded the contract to Lockwood.

Plaintiff raises, essentially two issues with respect to MTMC's award to Lockwood: (1) that MTMC was obligated to allow Calore to increase the price to compensate for G.E.'s delay in readying the gears for shipment; and (2) that MTMC's award to Lockwood was illegal because Lockwood's bid for the Lynn Requirement was nonresponsive.

On the first issue, the General Accounting Office (GAO) has held in similar situations that a bidder may not condition an extension of its bid acceptance period upon an increase in price. In *Carnes Construction, Inc.,* B–241778, 91–1 CPD ¶ 215 (1991), Carnes submitted the lowest of eight bids for the construction of an Army training facility. Carnes' bid, by its terms, had a thirty day acceptance period. The award, however, was delayed repeatedly for nearly ten months because of Army funding problems. Over the course of the ten month period, the Army asked the two low bidders to extend their bids. Carnes agreed to the first extension request without condition. When the Army made its second request for an extension of the bid acceptance period Carnes responded that it would extend its bid only if the Army

---

**27.** Notably, Calore's testimony indicates his belief that once a tender expires it is no longer valid. Calore testified that he said to Bono, "I thought I was being fair. If the barge was here.

And you're going to write the change in tender. It's gone. My tender has expired. Legally, its not even any good." Tr. 197.

would allow Carnes to increase its price. Even with the price increase Carnes' bid was still lower than the next low bid. The Army refused to allow the price increase, and awarded the contract to the bidder who stood by its original bid, even though it was higher than Carnes' bid. Carnes, like CRC, protested arguing that it should have been allowed to revive its bid with a price increase since its revised bid was lower than the next low bidder.

The Comptroller General noting that the "expiration of the acceptance period confers on the bidder a right to refuse to perform a contract subsequently awarded" rejected Carnes argument holding that "Bidders may not revise their bid prices when granting a bid acceptance period extension, since to do so would be tantamount to submitting a second bid after bid opening contrary to competitive bidding principles." *Id.* at 2. *See also Kos Kam, Inc.*, B–221806, 86–1 CPD ¶ 460 (1986) (holding that where a bidder qualifies an extension to its bid acceptance period by conditioning it upon a price increase, that bidder is ineligible for award after the original bid expires). In the instant case, MTMC had available to it two bids which had not yet expired. Allowing CRC to increase its bid without allowing Lockwood and Loveland to revise their bids would be "contrary to competitive bidding principles."

Again, assuming for the sake of argument, that the Tender of Rates constituted a contract between CRC and MTMC, both the FAR and CDA apply.[28] Pursuant to the CDA and the FAR's Disputes clause, plaintiff was required to submit a certified claim to the contracting officer on the Lynn Requirement, in this case the Commander, MTMCEA,[29] before submitting its claim to the court. 41 U.S.C. § 605(a); 48 C.F.R. § 52.233–1. Plaintiff did not do so and has therefore failed to exhaust his administrative remedy before filing suit in this court. Thus the court would not, in any event, have a favorable view of plaintiff's breach of contract claim.

Plaintiff contends that its costs "increased dramatically" as a result of G.E.'s delay. Calore testified that its costs had increased because the barge it was planning to use was in the Gulf of Mexico and it would cost $40,000 to bring it back empty. Notably, the additional $40,000 is nearly fifty percent of plaintiff's original tender price. Despite this increase in cost, plaintiff offered to perform the work for an increase of only $20,000. This was a remarkable offer on plaintiff's part. Calore testified in his deposition that CRC's initial bid had included a profit of only $10,000. Thus, by offering to perform the contract with an increased cost to it of $40,000, and only receiving an additional $20,000 in compensation, plaintiff now argues it was willing to do the work even though it would incur a $10,000 loss.[30] Moreover, under the terms of the tender, plaintiff was required to be prepared to move the gears, for the quoted price, until January 14, 1998, the tender's expiration date. The record is not clear on how long the covered barge Calore proposed using to perform the Lynn requirement had been in the Gulf of Mexico prior to Bono and Calore's meeting at or near the end of January 1998 or, for that matter, how long it would take to bring the proposed barge to Lynn, Massachusetts. Indeed, there is no evidence that the barge owner would be willing or able to return the barge in time to effect movement of the gears.

Next, plaintiff argues that MTMC's award of the Lynn Requirement to Lockwood was illegal because Lockwood's bid was allegedly nonresponsive. There is no significant evidence in the record to support this claim. Bono's testimony that "on paper" Lockwood's

---

**28.** Plaintiff cites *Cargo Carriers, Inc. v. United States*, 34 Fed.Cl. 634 (1995) (citing *Dalton*) for the proposition that the CDA does not apply to any MTMC procurements. This court respectfully disagrees with the *Cargo* court's reading of *Dalton.* As noted in footnote 26 of this opinion, the court reads the Federal Circuit's holding as narrowly drawn to apply to only those cases in which the GBL constitutes the contract between the parties. *Dalton*, 50 F.3d at 1021.

**29.** The GAO's decision in *Port Arthur*, states that the Commander, MTMCEA, fits within the CDA's definition of "contracting officer." *Port Arthur*, 89–3 BCA 22,004.

**30.** Plaintiff's offer to perform the Lynn Requirement at such a significant loss is inconsistent with its charge that the government is trying to bankrupt it.

bid was nonresponsive merely indicates that Lockwood did not use the word "covered" in its tender. Moreover, the fact that Lockwood called Doherty and asked if they could use shrink wrap in place of a covered barge indicates that Lockwood understood the solicitation's requirement of a covered barge. If, as plaintiff contends, Lockwood's bid was nonresponsive, i.e., it submitted its tender for an uncovered barge, and "the charter price of a covered barge is ten times that of an uncovered barge," then one could reasonably assume that when Lockwood told Doherty that it would take an additional five weeks to get a covered barge, Lockwood would have asked to increase its tender price tenfold.

Finally, the court finds no merit to plaintiff's contention that it was improper for MTMC to allow Lockwood to perform the move using shrink wrap instead of a covered barge. The circumstances surrounding MTMC's decision to allow Lockwood to perform the Lynn Requirement using shrink wrap instead of a covered barge compel the court to conclude that MTMC's decision was not arbitrary or capricious, an abuse of discretion or in bad faith. Under the solicitation issued in September 1997, the gears were scheduled for shipment "ASAP." As it turned out, G.E. did not have the gears ready for shipment for nearly four months. At the end of January 1998 MTMC learned that the gears would be ready to ship at the end of February 1998. By this time, CRC's bid, the selected tender, had expired and the barge it had proposed using to perform the move was somewhere in the Gulf of Mexico. As discussed above, CRC would not agree to extend its bid without a price increase. MTMC turned to Lockwood, the second low bidder whose tender was still in effect. Lockwood informed MTMC that it was willing to perform the move but it would need five weeks to obtain a covered barge. As an alternative to another delay, Lockwood suggested using shrink wrap to protect the gears, an option it had previously raised during bidding. MTMC weighed its options. Faced with an additional five week delay it considered the shrink wrap option. After obtaining the ap-

proval of all the involved parties and the proper government authority, MTMC approved Lockwood's use of shrink wrap to perform the Lynn Requirement. There is no hint of a Doherty led conspiracy to prevent Calore from performing the Lynn Requirement. Indeed, Bono unequivocally testified that had Calore agreed to perform at his original tender price, CRC would have been awarded the contract. Doherty testified, and plaintiff conceded, that she had no authority nor did she have any responsibility to participate in the contract award process. As Transportation Officer, Doherty was responsible for coordinating the shipment among all the involved parties. The authority to award the Lynn Requirement was vested in Bono. Finally, there is no reason to doubt, had Calore agreed to perform as he bid, that he would have been permitted to shrink wrap the gears had he made such a request.[31]

## CONCLUSION

Plaintiff seeks a permanent injunction and a declaratory judgment instructing MTMC not to *de facto* debar plaintiff from future procurements. As noted in the main text, it is presumed that government officials perform their duties conscientiously. Plaintiff has not rebutted that presumption with respect to the three solicitations at issue in this case. Because the court has concluded that plaintiff's bids were given the fair and honest consideration they were due, there is no reason to issue a declaratory judgment. The presumption remains that the government will continue to deal honestly and fairly with plaintiff.

Accordingly, based on the foregoing, plaintiff's motion for a permanent injunction and other relief is denied. The Clerk shall dismiss the amended complaint. No costs.

---

**31.** While not raised by the parties, the maritime aspects of the contracts in issue do not appear to put in question the court's jurisdiction. *See Alaska Barge & Transport, Inc. v. United States,* 179 Ct.Cl. 216, 220–21, 373 F.2d 967, 970–71 (1967).